UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

BROTHERHOOD OF LOCOMOTIVE
ENGINEERS AND TRAINMEN GENERAL
COMMITTEE OF ADJUSTMENT CSX
TRANSPORTATION NORTHERN LINES,

        Plaintiff/Petitioner,

v.                                      **CASE NO. 3:05-cv-00018-JHM-TEM**

CSX TRANSPORTATION, INC.

and

UNITED TRANSPORTATION UNION
BALTIMORE & OHIO SYSTEM C-T & E,

        Defendants/Respondents.

_____/

## O R D E R

Before the Court is Plaintiff's Petition for Review and Vacation of Arbitration Award (Dkt. 1), to

which Defendant United Transportation Union General Committee of Adjustment (GO-049) ("UTU GCA")

filed an Answer and Counterclaim for Enforcement of Arbitration Award (Dkt. 14). Defendant CSX

Transportation, Inc. ("CSXT") also filed an Answer to Plaintiff's petition, a Cross-Claim against Defendant

UTU GCA and a Counterclaim against Plaintiff (Dkt. 16). Plaintiff subsequently filed an Answer to

Defendant CSXT's Counterclaim (Dkt. 24) and a Reply to the Counterclaim of Defendant UTU GCA (Dkt.

26). Defendant UTU GCA also filed an Amended Answer to Defendant CSXT's Counterclaim (Dkt. 25).

Plaintiff filed a Motion for Summary Judgment (Dkt. 37) with Supporting Memorandum (Dkt. 46)

and a Statement of Facts that are Material and not Subject to Dispute (Dkt. 38), to which Defendant CSXT

filed a Response (Dkt. 52). United Transportation Union ("UTU"), on behalf of Defendant UTU GCA,

filed a Motion for Summary Judgment (Dkt. 35) with Supporting Memorandum (Dkt. 36), to which both Plaintiff filed a Memorandum in Opposition (Dkt. 50) and Defendant CSXT filed a Memorandum in Opposition (Dkt. 53). Defendant CSXT filed a Motion for Summary Judgment (Dkt. 41) with Supporting Memorandum (Dkt. 42) and a Statement of Undisputed Material Facts (Dkt. 43). UTU filed a Memorandum in Opposition to Plaintiff's and CSXT's Motion for Summary Judgment (Dkt. 51). The parties also filed Joint Exhibits to Parties' Motions for Summary Judgment (Dkt. 44).

I.      **Parties**

The Brotherhood of Locomotive Engineers and Trainmen ("BLET")[1] is the designated representative for collective bargaining of employees of CSXT working in the class or craft of locomotive engineer. 45 U.S.C. § 151 Sixth. Plaintiff is an unincorporated labor association with headquarters in Ponte Vedra, Florida and is the division of BLET responsible for providing representation to CSXT engineers employed on CSXT's Northern Lines.[2] Plaintiff is therefore party to collective bargaining agreements with CSXT covering engineers working on CSXT's Northern Lines, including agreements concerning the seniority of these engineers.

The United Transportation Union ("UTU") is the designated representative for collective bargaining of employees of CSXT working in the classes or crafts of train service. 45 U.S.C. § 151 Sixth. UTU GCA is an unincorporated labor association with headquarters in Jacksonville, Florida and carries out the representative function of the UTU for trainmen and conductors employed by CSXT on CSXT's Northern Lines. UTU GCA is party to collective bargaining agreements with CSXT that address the

---

[1] BLET's predecessor union, the Brotherhood of Locomotive Engineers ("BLE"), is cited in the arbitration award (Dkt. 43, ¶ 3).

[2] The former Baltimore and Ohio Eastern and Western Districts are collectively referenced as the "Northern Lines" (Dkt. 43, ¶ 8).

seniority of trainmen and conductors working on CSXT's Northern Lines. UTU GCA is also party to agreements concerning the promotion of  trainmen and conductors to engineer positions based on their relative trainmen and conductor seniority standing (Dkt. 1, ¶ 7).

Defendant CSXT is a rail carrier as defined in 45 U.S.C. §151 First, with a principal place of business in Jacksonville, Florida. CSXT is party to separate collective bargaining agreements with BLET for engineers' seniority rights and UTU for trainmen seniority rights (Dkt. 43, ¶7).

## II.    Background

This dispute arises from the parties' disagreement over the proper placement of employees on the Northern Lines engineer seniority rosters. Specifically, the dispute concerns the standing of both professional engineers hired by CSXT ("professional hires") and engineers transferred ("transferees") from another CSXT seniority district to the Northern Lines, and with the standing of trainmen and conductors promoted to engineer. For purposes of clarity, the Court will outline the applicable agreements governing seniority.

In 1985 CSXT and UTU were party to a National Agreement ("1985 Agreement") which provides that trainmen are the first source of supply for engineers. The 1985 Agreement also establishes procedures for selecting and training the trainmen to become engineers (Joint Exhibit ("JE") 1 at 2-4). Prior to becoming an engineer, a trainman must attend a training program and will only be promoted to engineer upon successful completion of the program. The 1985 Agreement, however, contains an exception to the rule that trainmen are the first source of supply for engineers. The exception provides that in instances where there are insufficient trainmen on a seniority district available for training and promotion, CSXT is authorized to use professional hires and transferees in order to meet its engineering needs (JE 1 at 3-4, 1985 Agreement Article XIII §§ 3(1), 4(4)).

3

In 1996, CSXT and BLET entered into an agreement ("1996 BLET Agreement") that governs engineers' seniority.[3] The 1996 BLET Agreement addresses the placement of trainmen recently promoted to engineer as well as the placement of professional hires and transferees on engineer seniority rosters. Article XVI(a) of the 1996 BLET Agreement sets out that promoted trainmen, upon successful completion of the engineer training program, will acquire engineer seniority based upon their date of entry into the training program. Article XVI(b) of the 1996 BLET Agreement provides that for professional hires and transferees, their seniority date will reflect the date they first performed service in the new district.

With the existence and application of these two agreements, CSXT found an increased level of confusion as to the issue of trainmen establishing engineer seniority relative to professional hires and transferees within CSXT's system. In an attempt to alleviate this situation, a proposal was sent in December 1997 by CSXT to UTU GCA and Plaintiff regarding a common rule for operating crafts that would establish a single seniority date (JE 1 at 6). While Plaintiff and UTU GCA agreed in principle with the proposal, they were unable to find compatible language. Id. This proposal was therefore rejected. However, on October 28, 1998, CSXT submitted another proposal to UTU. This second proposal created a single seniority date for operating craft employees establishing seniority on or after January 1, 1999. This proposal, which was not submitted to BLET, was signed on November 23, 1998 and is known as CSXT Labor Agreement 4-118-98 (JE 1 at 6).[4]

However, on December 8, 1999, UTU GCA's General Chairman sent a letter to CSXT expressing disdain over continuing complaints regarding the proper selection of trainmen for engineer training. The letter specifically emphasized that CSXT Labor Agreement 4-118-98's intent of establishing a single

---

[3] The Board misidentified the 1996 BLET Agreement as being from 1986 (JE 1 at 4).

[4] On August 18, 1999 CSXT and UTU GCA reached a further understanding regarding how trainmen would be selected for the engineer training program (JE 1 at 6-7).

operating craft seniority date had not been implemented. The letter also took exception to CSXT's hiring of professional engineers and alleged that an existing supply of train service employees could have been trained and promoted to engine service to fill CSXT's needs. Indeed, by 1999 CSXT was experiencing a shortage of engineers on its Northern Lines. This shortage was a result of increased business as well as CSXT's acquisition of a large portion of the Consolidated Rail Corporation ("Conrail"). CSXT satisfied this need in part by exercising its right under Article XIII §§ 3(1) and 4(4) of the 1985 Agreement to employ professional hires and transferees. These engineers were placed on the Northern Lines engineer seniority rosters in compliance with Article XVI(b) of the 1996 BLET Agreement. See (Dkt. 42 at 5).

Because the concerns raised in the December 8, 1999 letter continued to be problematic, representatives from CSXT, Plaintiff and UTU GCA agreed to meet in late December 1999 in an effort to resolve these issues. The representatives' efforts came to fruition in the form of an agreement[5] that was memorialized in a letter dated January 6, 2000 from CSXT to the General Chairmen of Plaintiff and UTU GCA ("January 2000 Agreement"). The January 2000 Agreement provided, in pertinent part, that "effective January 1, 2000, employees with a train service seniority date (on or after November 1, 1985) on the B&O Eastern or Western Consolidated Seniority Districts will be placed on the appropriate Engineer's Seniority Roster based upon their relative standing on their respective train service roster." (JE 4 at exhibit F). This was contingent on the employees successfully completing the engineer training program when it was first offered. Id.

On March 31, 2000, UTU GCA's General Chairman complained to CSXT that the sequencing of trainmen on the Northern Lines engineer seniority rosters was not being done in accordance with the

---

[5] As will be further explored below, Plaintiff contends this "agreement," known as the January 2000 Agreement, was actually only an understanding that never rose to the level of an agreement.

January 2000 Agreement. CSXT responded on July 17, 2000 that the seniority rosters in question were being reviewed "to identify the post-November 1, 1985 trainmen who stood for promotion to engineer." (JE 1 at 7).  CSXT also informed UTU GCA's General Chairman that Plaintiff's General Chairman had recommended that June 1, 1999 be used instead of the January 2000 Agreement's date of January 1, 2000 for establishing relative standing of trainmen for promotion to engineer.[6] This modification was reluctantly approved by the UTU GCA General Chairman and was ratified by BLET's local chairmen on the Northern Railroad Lines (JE 1 at 8). This change in date therefore modified the January 2000 Agreement.

Despite this modification, the expected action by CSXT with respect to formulating  the seniority rosters in question so that they would reflect the sequencing of trainmen on the Northern Lines in relative trainmen order, failed to materialize. This failing could be related to the fact that Plaintiff's General Chairman advised CSXT that his Organization's International Division refused to give him permission to execute the January 2000 Agreement due to concerns over the establishment of a single seniority date (JE 1 at 8, n.5).

Nevertheless, CSXT and Plaintiff subsequently executed a separate collective bargaining agreement, CSXT Labor Agreement 1-085-99 ("2001 BLET Agreement"), effective January 11, 2001. The 2001 BLET Agreement provided a single seniority roster that allowed train service employees to maintain their relative standing upon promotion to engineer (JE 1 at 8). This agreement also created a "hiring pool" that allowed "all train service employees in a district to make application to the hiring pool for that district in the same relative order that they have on the comparable trainmen's roster. . . ." Id. at 8-9. A pertinent provision of the 2001 BLET Agreement is the following:

Certified engineers who are hired or transferred from another road, or from one former road to another

_____

[6] June 1, 1999 is the date CSXT had acquired a portion of Conrail.

> former road within the CSXT system, will establish a new seniority date on the appropriate engineer seniority district roster, based on the date they commence qualifying on the district . . . Engineers establishing seniority under the provisions of this paragraph will not rank ahead of train service employees on the district who are currently engaged in engineer training, but will establish seniority ahead of train service employees whose names appear on hiring pool rosters but have not yet entered formal training. If permanently transferred, they will forfeit seniority on the former district(s) from which transferred.

(JE 1 at 9). The language stating that hired engineers or transferred engineers will establish a new seniority date "based on the date they commence qualifying on the district," reflects the language found in Article XVI(b)(i) of the 1996 BLET Agreement.

UTU GCA's General Chairman, both prior to and subsequent to the execution of the 2001 BLET Agreement, objected arguing it violated a prior agreement between CSXT and UTU (JE 1 at 9, n.8). CSXT responded that the intent of the 2001 BLET Agreement was to establish a single operating craft date and provide the method by which train services employees would be sequenced on the Northern Lines engineer seniority rosters. Id. at 9. Nevertheless, in order to address this issue, CSXT agreed to meet with the General Chairmen of Plaintiff and UTU GCA on March 21, 2001. The parties also agreed to undertake the process of identifying existing engineers that would be impacted by the reordering of the seniority rosters.

The relevant rosters were reviewed by CSXT and Plaintiff's General Chairman. Apparently, after reviewing the reordering of the Northern Lines rosters, Plaintiff's General Chairman approved the revisions. CSXT therefore informed UTU GCA's General Chairman on May 1, 2001 that the reordered rosters would be implemented throughout the Northern Lines. To that end, on May 15 and 16, 2001, the Northern Lines rosters were revised and published.[7] The rosters reflected that "[a]ll post-November 1, 1985 trainmen who had been promoted or had not yet been promoted to engine service were given a June 1, 1999

---

[7] The Board's award lists both May 15 and 16, 2001 and May 16 and 17, 2001 as the dates the revised rosters were issued (JE 1 at 9, 23).  It appears to the Court that the B&O Western District roster was issued on May 15, 2001 and B&O Eastern District roster was issued on May 16, 2001.

engineer's seniority date with a tie breaker to reflect their relative trainman's seniority standing." (JE 1 at 9).

However, on May 18, 2001, Plaintiff's General Chairman contacted CSXT arguing the rosters be cancelled and be returned to their original status. The impetus behind this demand was Plaintiff's General Chairman's discovery that thirty-two (32) professional hires and eleven (11) transferees, who had been used to address shortages after the Conrail acquisition, had established seniority on the Northern Lines after June 1, 1999. In other words, the revised seniority rosters slotted the forty-three (43) professional hires and transferees below subsequently promoted trainmen, despite the fact the forty-three professional hires and transferees had been working as engineers for a longer period of time.[8] Additionally, Plaintiff's General Chairman also informed CSXT that the BLE International Division would not permit him to apply the 2001 BLET Agreement retroactive to June 1, 1999 (JE 1 at 10). Concerned about the adverse impact on these forty-three engineers, CSXT decided to rescind the newly released seniority rosters for the Northern Lines.

On June 4, 2001, CSXT met with the General Chairmen of UTU GCA and Plaintiff to discuss the seniority roster placement issue. Plaintiff's General Chairman contended that under the terms of the 2001 BLET Agreement, the professional hires and transferees, being certified engineers, must be placed ahead in terms of their order on the trainmen's seniority roster. This would avoid the professional hires and transferees lower placement on the engineer seniority rosters. Conversely, UTU GCA's General Chairman argued Plaintiff's General Chairman's reliance on the 2001 BLET Agreement failed to square with his prior approval of January 1, 2000 and then June 1, 1999 as the date for setting the relative seniority standing of trainmen for promotion to engineer. CSXT, at the conclusion of this meeting, stated it would submit a

---

[8] The professional hires and transferees placement on the revised seniority rosters was based upon their trainmen seniority date on the Northern Lines trainmen rosters and not the date upon which they first worked as engineers on the Northern Lines (Dkt. 42 at 8).

solution in writing and that Plaintiff and UTU GCA should prepare and exchange separate written responses if their respective positions differed from CSXT's proposed solution (JE 1 at 10).

The solution proffered by CSXT was opposed by both parties as Plaintiff and UTU GCA provided similar objections to those raised at the June 4, 2001 meeting.[9] Because the parties were unable to reach a solution, the matter was submitted to arbitration.

## III.  Procedural Posture

45 U.S.C. § 153 First (q) empowers United States district courts to review arbitration awards of the National Railroad Adjustment Board and other adjustment boards established under 45 U.S.C. § 153 Second. The parties in this case, in accordance with 45 U.S.C. § 153 Second, agreed to establish the Special Board of Adjustment (the "Board") for purposes of allowing them to submit their dispute to arbitration. The parties selected Arbitrator Charles P. Fischbach as the neutral, and only, member of the Board.

The Board held hearings on December 3 and 18, 2001, during which the Board requested additional information concerning CSXT's hiring needs by location from 1999 and 2000, in relation to the hiring and use of professional hires. The Board also requested information related to the supply points where CSXT transferred engineers to the Northern Lines (JE 1 at 16). The Board issued its arbitration award on October 18, 2004 supporting the position advocated by UTU GCA. On January 7, 2005 and pursuant to 45 U.S.C. § 153 First (q), Plaintiff filed a petition with this Court to review and vacate the Board's arbitration award.

## IV.  Findings & Opinion of the Board

After reviewing the documentation submitted by the parties, the Board found that CSXT's decision

---

[9] UTU GCA again contended the sequencing of trainmen promoted to engineer should be governed by the January 2000 Agreement, as modified, and done in terms of their relative seniority standing as trainmen. Specifically, UTU GCA argued the professional hires and transferees trainman seniority date should be used as the date for placing them on the engineer seniority rosters. Plaintiff, meanwhile, argued for the application of the 2001 BLET Agreement.

to cancel the revised Northern Lines seniority rosters, published on May 15 and 16, 2001, was improper and ordered CSXT to restore and republish the rosters (JE 1 at 23). These rosters placed the forty-three professional hires and transferees below subsequently promoted trainmen on the Northern Lines engineer seniority rosters, despite the fact the professional hires and transferees began working on the Northern Lines before some of the trainmen were promoted to engineer.

To support its conclusions, the Board began by finding that the parties reached an accommodation, which "briefly came to fruition," when the Northern Lines seniority rosters were prepared by CSXT, reviewed and acquiesced in by UTU GCA and Plaintiff and then published by CSXT (JE 1 at 17). However, when CSXT decided to rescind the newly published seniority rosters, the Board found this action "unraveled the earlier approved understanding" reached between CSXT and the General Chairmen of Plaintiff and UTU GCA. Id. The Board therefore began reviewing the solutions put forth by the parties.

Specifically, the Board proceeded to analyze the proffered solution by CSXT whereby the "43 professional hires and permanent transfers would establish the seniority date, in relative trainman seniority order, for trainmen who already established an engineer's seniority date and had been promoted to engine service subsequent to the placement of the 43 professional hires and permanent transfers" on the Northern Lines engineer seniority rosters (JE 1 at 18). CSXT believed this seniority sequencing recognized its right to employ professional hires and to permit transferees during periods of engineer shortage and that CSXT understood such a sequencing method to be in compliance with the 1985 Agreement. The Board, however, disagreed.

In reviewing the 1985 Agreement, the Board noted that Article XIII Section 3(1) clearly establishes that in selecting new applicants for engine service, "opportunity shall first be given" to employees in train and yard service. (JE 1 at 3). The Board found that while this language demonstrates train and yard service

employees have a contractual right for first opportunity, they are not the only source of applicants for engine service. Additionally, Section 4(4) of Article XIII provides that when the "carrier's needs for engine service employees are not met during a period when there are not sufficient trainmen," a carrier may hire qualified engineers or train others for engine service. Id. at 4. Taking these sections into account, the Board found that "at first blush" it would appear that CSXT's proffered solution "was in harmony with the pertinent provisions of Article XIII of the 1985 UTU National Agreement." (JE 1 at18). However, the Board concluded that due to the factual circumstances considered "in context with the misapplication of Article XIII provisions [1985 Agreement]" and the parties intent to do otherwise, CSXT's proposed solution of placing professional hires and transferees above trainmen promoted or awaiting promotion on the engineer seniority rosters, was untenable. Id.

Notably, the Board stated it was "unable to discern from the evidence of record whether CSXT's hiring of 32 FRA [Federal Railroad Administration] certified engineers and the transfer of 11 other engineers within its railroad system to operate on the former B&O property was in strict compliance with Section 4(4) and not violative of Section 3(1) of Article XIII." (JE 1 at 19). In other words, the Board found "in the absence of probative evidence that the source of train service employees had been exhausted" or that there were an insufficient number of trainmen available to fulfill the needs of engine service employees on CSXT's Northern Lines, CSXT's proposed solution of seniority sequencing failed to "justify its departure from the parties' contrary arrangement which had culminated in the publication" of the revised rosters on May 15 and 16, 2001 (JE 1 at 19). The Board also found that CSXT erred in its unilateral recision of these rosters, especially after they had been reviewed and acquiesced in by the Chairmen of UTU GCA and Plaintiff. Id.

The Board further noted that the remedy put forth by Plaintiff's General Chairman also failed to

justify the cancellation of the rosters. Plaintiff's General Chairman asserted that the 2001 BLET Agreement, whereby professional hires and transferees establish seniority on the first date they work in a new district, is the applicable agreement as the January 2000 Agreement, as modified, never became a binding agreement on Plaintiff. Plaintiff's proposed remedy was to enforce the terms of the 2001 BLET Agreement which would have the practical effect of preventing the forty-three engineers in question from being adversely placed on the seniority rosters. This remedy would allow Plaintiff to use January 1, 2001, and not June 1, 1999, as the date that establishes the standing of trainmen promoted to engineer.[10] Using January 1, 2001, which closely corresponds to the signing of the 2001 BLET Agreement, would allow Plaintiff to avoid the forty-three engineers being placed lower on the seniority rosters.

The Board rejected these arguments as inconsistent and found that the January 2000 Agreement, as modified, "rose to the level of a binding agreement when the[] Seniority Rosters were published after being scrutinized by the UTU and BLE." (JE 1 at 22).[11]  The Board outlined that Section 3(1) of Article XIII in the 1985 Agreement, which provides "opportunity shall first be given to employees in train and yard service," represents a contractual commitment that cannot be abridged or circumvented by CSXT or Plaintiff (JE 1 at 20). The Board further found that this contractual commitment, taken in conjunction "with the fact there was an adequate source of supply of train and yard service employees. . .controverts" CSXT's "unfettered discretion" to employ the professional hires and transferees as well as Plaintiff's argument that those engineers' seniority roster placement should be higher (JE 1 at 20).

Moreover, the Board also found that Plaintiff's General Chairman lacked the authority to enter into

---

[10] The Board's award references Plaintiff arguing for the date in which promoted trainmen would be placed in seniority order as being January 1, 2001 and January 11, 2001 (JE 1 at 20-22).

[11] The Board also noted that Plaintiff's General Chairman reviewed the revised seniority rosters prior to being published and that "[i]t strain's one credulity that the BLE General Chairman was unaware" of the forty-three engineers working in engine service on the Northern Lines (JE 1 at 21).

an agreement with CSXT that would "contravene th[e] contractual commitment" set forth in Section 3(1) of Article XIII. Id. The Board specifically  concluded that contractual authority did not extend to CSXT or Plaintiff that would allow, either unilaterally or bilaterally and at the exclusion of UTU GCA, the implementation of a seniority sequencing method that would be to the disadvantage of trainmen promoted or awaiting promotion during the period in dispute.

Overall, the Board found that it could not alter the date from June 1, 1999 to January 1, 2001 as the engineer seniority date for trainmen promoted or awaiting promotion to engine service on the Northern Lines (JE 1 at 21). The Board concluded that based "on information and belief," CSXT had a supply of trainmen available for training and promotion at the time the forty-three engineers began working on the Northern Lines (JE 1 at 22). This availability, the Board found, prevented CSXT or Plaintiff from relying on Section 4(4) of Article XIII in the 1985 Agreement "as authority" for a higher placement of the forty-three engineers. Id. In light of the foregoing, the Board determined the May 15 and 16, 2001 rosters should be restored and republished.

## V.    Standard of Review

Under the Railway Labor Act ("RLA"), 45 U.S.C. § 153 First (q), judicial review of railway labor arbitration awards is "extremely narrow." Bhd. of Locomotive Engineers v. Atchison, Topeka and Santa Fe Ry. Co., 768 F.2d 914, 921 (7th Cir. 1985). See Loveless v. Eastern Air Lines, Inc., 681 F.2d 1272, 1275 (11th Cir. 1982). Specifically, 45 U.S.C. § 153 First (q) limits a reviewing court's ability to set aside an arbitral award to three grounds: (1) if the board failed to comply with the RLA; (2) if the board failed to conform, or confine itself, to matters within the scope of its jurisdiction; or (3) for fraud or corruption.[12]

---

[12] Although 45 U.S.C. § 153 First (q) addresses awards issued by the National Railroad Adjustment Board, the same standard of review has been applied by courts in the review of any RLA adjustment boards. See Bhd. of Ry., Airline and S.S. Clerks, Freight Handlers, Express and Station Employees v. Jacksonville Terminal Co., 591 F.2d 1387, 1390 (5th Cir. 1979); Atchison, Topeka and

See Union Pacific R.R. Co. v. Sheehan, 439 U.S. 89, 93 (1979)(stating that "[o]nly upon one or more of these bases may a court set aside an order of the Adjustment Board")(internal citations omitted)); Norfolk and Western Ry. Co. v. Transp. Communications Int'l Union, 17 F.3d 696, 699 (4th Cir. 1994). "Under this standard, a court 'may not overrule an arbitrator's decision simply because it believes its own interpretation of the contract would be the better one.'" Norfolk and Western Ry. Co., 17 F.3d at 699 (quoting W.R. Grace and Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of Am., 461 U.S. 757, 764 (1983)).

However, where a party asserts a Board has exceeded its jurisdiction, the Eleventh Circuit articulated that "courts have determined this provision of section 153 is, in effect, a statutory codification of certain substantive grounds that would justify the vacation of an arbitral award in other areas of labor law." Loveless, 681 F.2d at 1276 (internal citations omitted). The Eleventh Circuit proceeded to outline three interrelated grounds that provide for such substantive review of arbitral awards. These grounds are: (1) whether the award is irrational; (2) whether the award draws its essence from the letter or purpose of the collective bargaining agreement; and (3) whether the arbitrator conformed to a specific contractual limitation upon his authority. Id. (internal citations omitted). A court may therefore vacate an arbitral decision as in excess of a board's jurisdiction upon one of these three grounds. See Norfolk and Western Ry. Co., 17 F.3d at 700.

## VI.   Summary Judgment Standard

The Court should grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact [such] that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

---

Santa Fe Ry. Co., 768 F.2d at 921.

56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Everett v. Napper</u>, 833 F.2d 1507, 1510 (11th

Cir. 1987); <u>Edwards v. Acadia Realty Trust, Inc.</u>, 141 F. Supp. 2d 1340, 1344-45 (M.D. Fla. 2001).  The

Court will construe the record and all inferences that can be drawn from it in the light most favorable to

the nonmoving party, and the moving party bears the initial burden of establishing the absence of a genuine

material fact.  <u>See</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Samples on Behalf of Samples</u>

<u>v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988).  Once this burden is met, however, the opposing

party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for

trial.'"  <u>Celotex Corp.</u>, 477 U.S. at 342.  The Eleventh Circuit explained in <u>Samples</u> that the opposing party

need only present evidence from which a jury might return a verdict in its favor in order to survive the

moving party's motion for summary judgment.  <u>See</u> <u>Samples</u>, 846 F.2d at 1330; <u>see</u> <u>also</u> <u>Augusta Iron &</u>

<u>Steel Works v. Employers Insurance of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988).

Notably, the Supreme Court pointed out in <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986), that the moving party's burden only extends to facts that might affect the outcome of the lawsuit

under the governing law, as "[f]actual disputes that are irrelevant or unnecessary will not be counted."

Summary judgment will only be granted if all facts and inferences point overwhelmingly in favor of the

moving party, such that a responsible jury could not find in favor of the opposing party.  <u>See</u> <u>Reeves v.</u>

<u>Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000).  If there is conflicting evidence that will permit

differing reasonable inferences, the case will be submitted to the jury.  <u>See</u> <u>Augusta Iron & Steel</u>, 835 F.2d

at 856.

**VII.    The Parties' Arguments**

**A.      UTU GCA's Counterclaim for Enforcement**

15

UTU GCA moves for summary judgment for its Counterclaim (Dkt. 14) and seeks the Court to enter an order enforcing the award and directing the parties to make the award effective immediately, as well as dismissing Plaintiff's petition and granting UTU GCA costs and reasonable attorney's fees.[13] Id. at 8.

UTU GCA's Motion for Summary Judgment (Dkt. 35) is largely dedicated to outlining the deferential standard required by district courts in reviewing arbitration awards under the RLA. See Atchison, Topeka and Santa Fe Ry. Co. v. United Trans. Union (CT&Y), 175 F.3d 355, 357 (5th Cir. 1999)(noting that under the RLA, "'judicial review in enforcement cases is among the narrowest known to law.'")(quoting Diamond v. Terminal Ry. Ala. State Docks, 421 F.2d 228, 233 (5th Cir. 1970)). UTU GCA asserts that Plaintiff, and to an extent CSXT, essentially argue the Board exceeded its jurisdiction or failed to comply with the RLA. UTU GCA further argues that Plaintiff and CSXT are "unhappy" their proposed solutions were not accepted and are therefore attempting to overturn the award. UTU GCA contends the Board found that CSXT did not meet its burden under Section 4(4) of Article XIII in the 1985 Agreement to hire outside engineers and that those engineers should consequently not outrank promoted trainmen on the seniority rosters. In all, UTU GCA contends the award was well reasoned and not irrational and the Court should enforce it.

**B.     Plaintiff's Arguments**

Plaintiff's Motion for Summary Judgment (Dkt. 37) provides the Court with an analysis outlining why the Board's award, in part, must be vacated. Specifically, Plaintiff contends the Board's determination as to the placement of professional hires and transferees on the seniority rosters must be vacated pursuant to 45 U.S.C. § 153 First (q). Moreover, Plaintiff's Petition for Review and Vacation (Dkt. 1) provides that

---

[13] The Court notes that UTU GCA's Motion for Summary Judgment (Dkt. 35) was filed by UTU.

vacation is appropriate because the Board failed to comply with the requirements of the Railway Labor Act ("RLA") and failed to conform or confine itself to matters within the scope of its jurisdiction (First Cause of Action); the Board's award was without basis in fact and was without rational support (Second Cause of Action); the Board issued an award that fails to draw its essence from the relevant agreements (Third Cause of Action); the Board applied its own brand of industrial justice rather than interpreting and applying the parties' agreements (Fourth Cause of Action) and the Board denied Plaintiff due process (Fifth Cause of Action).

Plaintiff asserts that while the 1985 Agreement does provide first priority in filling engineer positions be given to train and yard service employees, it also authorizes CSXT to employ professional hires and transferees when sufficient trainmen and promoted conductors are not available to begin training for the open engineer positions.[14] Plaintiff asserts that under the 1996 and 2001 BLET Agreements, CSXT has the right, when necessary, to employ professional hires and allow transferees to move from other engineer seniority districts. Plaintiff also argues that the 1996 BLET and 2001 BLET Agreements provide clear and unambiguous language that professional hires and transferees will rank above trainmen and conductors who subsequently enter and complete engineer training (Dkt. 46 at 9). In light of these agreements, Plaintiff argues the Board's placement of the professional engineers and transferees on the seniority rosters demonstrates the Board "simply ignored the plain and unambiguous language" of the agreements and that this aspect of the award should therefore be vacated (Dkt. 46 at 9). See United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960); Storer Broad. Co. v. Am. Fed'n of Television & Radio Artists, 600 F.2d 45, 47 (6th Cir. 1979).

_____

[14] The Court wants to clarify that while Plaintiff's Motion for Summary Judgment (Dkt. 37) references "trainmen and conductors," the Board appears to encompass them both under the singular word trainmen.

Plaintiff also argues the 1996 and 2001 BLET Agreements provide professional hires and transferees will accrue Northern Lines engineer seniority on the date they begin service. Thus, the Board's award of slotting these professional hires and transferees, after they have already begun working, below subsequently promoted trainmen and conductors, fails to draw its essence from the applicable agreements. Enter. Wheel & Car Corp., 363 U.S. at 597. Plaintiff contends this is further underscored by the silence of the 1985 Agreement on the ranking of promoted trainmen and conductors relative to professional hires and transferees on engineer seniority rosters. Plaintiff provides such silence is proper as UTU and CSXT are unable to enter into an agreement dictating terms of seniority on an engineer roster. Using the silence of the 1985 Agreement and the language in the 1996 and 2001 BLET Agreements, Plaintiff again contends professional hires and transferees would have to rank above trainmen and conductors who entered engineer training after the professional hires and transferees began service on the Northern Lines. Consequently, Plaintiff asserts this aspect of the Board's findings did not draw its essence from either the 1985 Agreement nor the BLET Agreements and should therefore be vacated. See 45 U.S.C. § 153 First (q); Enter. Wheel & Car Corp., 363 U.S. at 597 (stating "an arbitrator is confined to the interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. . .[and] his award is legitimate only so long as it draws its essence from the collective bargaining agreement."); Loveless, 681 F.2d at 1276.

Additionally, Plaintiff asserts the Board's reliance on the January 6, 2000 letter describing an understanding between the parties is misplaced. Plaintiff contends that despite the Board noting that the BLET International Division refused to allow execution of the January "understanding," the Board nevertheless found there to be an agreement binding upon Plaintiff.[15] Indeed, Plaintiff argues the Board

---

[15] Plaintiff asserts "review of the letter issued by CSXT on January 6, 2000. . .shows that it reflected CSXT's description of an understanding, it was never signed by BLET GCA [Plaintiff], and it

found CSXT's dissemination of the seniority rosters in May 2001 "elevated the January 2000 understanding to the level of agreement." (Dkt. 46 at 13). Plaintiff contends the Board lacks the authority to bind Plaintiff to an understanding that it was forbidden, by its Constitution and Bylaws, from executing. Even assuming the January 2000 understanding was an agreement, Plaintiff asserts it fails to support the Board's determination as to professional hires and transferees placement, as the understanding did not address those engineers' ranking. Combine this fact with the subsequent 2001 BLET Agreement that does address when professional hires and transferees will accrue seniority, and Plaintiff again argues the Board's award, with respect to the placement of professional hires and transferees, failed to draw its essence from the parties' agreements. Id. at 14-15.[16]

Lastly, Plaintiff contends the Board's conclusion that trainmen were available to be promoted to engineer positions and that CSXT's employing professional hires and transferees was violative of the 1985 Agreement, is "based on unfounded and indeed erroneous assumptions of fact."(Dkt. 46 at 18). Plaintiff contends the Board itself found that CSXT had provided evidence that a supply of trainmen were not available for training and promotion to engineer. Consequently, Plaintiff argues because the Board's determination as to the placement of professional hires and transferees was predicated on a non-existent fact,  yet another basis for vacating the award exists. See Bettencourt v. Boston Edison Co., 560 F.2d 1045, 1050 (1st Cir. 1977); Storer Broad. Co., 600 F.2d at 47.

## C.    CSXT's Arguments

---

refers to additional meetings for continuing discussions." (Dkt. 46 at 13).

[16] Plaintiff also asserts that in ignoring the agreements between the parties, the Board's award reflects a dispensing of the Board's own brand of industrial justice. Plaintiff argues the Board's function was to interpret the parties' agreements, not to "fix" them. In ignoring the agreements, Plaintiff asserts the Board applied its own brand of industrial justice (Dkt. 46 at 17).

CSXT seeks summary judgment for its Counterclaim (Dkt 16) and Cross-Claim (Dkt. 16) and requests the Court to vacate, in part, the Board's award. CSXT specifically asserts the Board exceeded its jurisdiction by purporting to find CSXT failed to comply with Article XIII of the 1985 Agreement and in its treatment of the seniority of professional hires and transferees (First Cause of Action). CSXT also argues the Board exceeded its jurisdiction and failed to comply with the RLA by ordering a treatment of the seniority of professional hires and transferees that was contrary to both Article XVI of the 1996 BLET Agreement and to the 2001 BLET Agreement (Second Cause of Action). Because CSXT agrees with the Board's finding that the January 2000 Agreement, as modified, controls the placement of trainmen on engineer seniority rosters, CSXT seeks enforcement of that portion of the award (Third Cause of Action).

CSXT contends the Board exceeded its jurisdiction in finding that professional hires and transferees should be slotted below trainmen and conductors who were promoted to engineer after the professional hires and transferees had already begun working on the Northern Lines. CSXT asserts Article XVI (b) of the 1996 BLET Agreement provides that professional hires and transferees seniority date is the date the engineer first performs service in the district. Moreover, the 2001 BLET Agreement mirrors the 1996 BLET Agreement in stating that professional hires and transferees will establish a seniority date on the date they first commence work in the district. Nevertheless, because the Board found that the forty-three engineers at issue should be slotted on the seniority rosters on the basis of their seniority as trainmen, as opposed to the date they first worked as engineers on the Northern Lines, CSXT contends the Board "completely ignored" the applicable language of these agreements and that this portion of the award should therefore be vacated. See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)(providing "[t]he arbitrator may not ignore the plain language of the contract. . . ."); Loveless, 681 F.2d at 1279.

CSXT also contends "[t]he linchipin" of the Board's treatment of professional hires and transferees is the finding that CSXT violated, by failing to demonstrate that an insufficient number of trainmen and conductors were available to fill the positions taken by the professional hires and transferees, Article XIII §§ 3(1) and 4(4) of the 1985 Agreement. However, CSXT asserts whether it violated Article XIII of the 1985 Agreement was not submitted as an issue by any of the parties to the Board and therefore should not have even been raised in the Board's award. CSXT argues the fact that the Board did use this issue as a basis for fashioning a remedy, demonstrates the Board exceeded its jurisdiction and was effectively dispensing its own notions of fairness.

As to the Board's determination that the January 2000 Agreement, as modified, governed the placement of professional hires and transferees, CSXT provides such a conclusion is not supported by the January 2000 Agreement, as modified, and is contrary to the 1996 BLET Agreement. Indeed, CSXT argues the January 2000 Agreement, as modified, addresses the placement of trainmen relative to other trainmen on engineer rosters and was not aimed at or applicable to the placement of professional hires or transferees.[17] CSXT further asserts the January 2000 Agreement, as modified, "did not purport to amend or replace the 1996 BLET Agreement" with respect to the placement of professional hires and transferees (Dkt. 42 at 17). However, based upon the Board's application of the January 2000 Agreement, as modified, to professional hires and transferees, CSXT argues the Board essentially repealed Article XVI(b) of the 1996 BLET Agreement, an authority the Board clearly lacks.

---

[17] CSXT asserts that under the January 2000 Agreement, as modified, a trainman promoted to engineer establishes the seniority date for all subsequently promoted trainmen. This results in all promoted trainmen having the same seniority date. The reasoning underlying this is because the 1996 BLET Agreement provides the tiebreaker in determining an employee's place on the engineer roster is his trainman seniority date. Consequently, even in instances where a junior trainman attends engineer training prior to trainmen with greater seniority, the senior trainman will be placed above the junior trainman on the engineer seniority roster once the senior trainman is promoted to engineer, because the senior trainman will win the tiebreaker (Dkt. 42 at 6).

Lastly, CSXT contends the Board's reasoning for disregarding the provisions in the 2001 BLET Agreement, that Plaintiff and CSXT could not contractually circumvent the rights of trainmen under the 1985 Agreement and that Plaintiff's General Chairman lacked the authority to enter into the 2001 BLET Agreement, exceeded the Board's jurisdiction and are contrary to the requirements of the Railway Labor Act ("RLA").[18] CSXT argues the 2001 BLET Agreement could not contravene the 1985 Agreement as the agreements govern separate and distinct issues. Moreover, the finding Plaintiff's General Chairmen lacked authority to enter into the 2001 BLET Agreement is itself contrary to the RLA as BLET is the exclusive representative of CSXT's engineers and thus has contractual authority to address seniority rights. See Dempsey v. Atchison, Topeka & Santa Fe Ry. Co., 16 F.3d 832, 839 (7th Cir. 1994)("[y]et it is well-established that. . .seniority rights arise out of the collective bargaining agreement entered into between the employer and the union)(citing Aeronautical Lodge v. Campbell, 337 U.S. 521, 526 (1949))(internal citations omitted).

**VIII.  Discussion**

After thoroughly reviewing the entire record and appreciating the complexity of the issues reviewed by the Board, the Court finds the Board did exceed its jurisdiction in its placement of the forty-three professional hires and transferees on the Northern Lines engineer seniority rosters. Alternatively, the Court also finds the Board failed to comply with the RLA when it determined Plaintiff's General Chairman lacked the contractual authority to enter into 2001 BLET Agreement.

**A.      The Placement of Professional Hires and Transferees**

In finding the Board exceeded its jurisdiction by failing to draw its essence from the parties' agreements, the Court notes that the 1985 Agreement is an agreement between CSXT and UTU. While the

_____

[18] CSXT states the 2001 BLET Agreement was executed before the January 2000 Agreement, as modified, was implemented (Dkt. 42 at 7).

1985 Agreement may provide first opportunity be given to trainmen when selecting applicants for engineer, it is properly silent as to the seniority standing of promoted trainmen relative to professional hires and transferees on engineer seniority rosters. The Court instead finds that Article XVI(b) of the 1996 BLET Agreement between CSXT and BLET addresses the seniority standing of professional hires and transferees on engineer seniority rosters. Indeed, according to CSXT, professional hires and transferees used after the Conrail acquisition were placed on the Northern Lines engineer seniority rosters in accordance with Article XVI(b) (Dkt. 42 at 5). However, the Board either intentionally ignored or purposefully failed to apply or discuss the 1996 BLET Agreement. Such action by the Board begins to demonstrate that the Board's placement of the forty-three engineers failed to draw its essence from the parties' agreements and instead resulted in the Board dispensing its own brand of industrial justice. Enter. Wheel & Car Corp., 363 U.S. at 597.

Additionally, the Court notes Article XVI(b)(i) of the 1996 BLET Agreement provides that "[w]hen the Carrier [CSXT] hires an engineer (a new employee who is FRA certified as an engineer and has worked as such for another Carrier) or transfers an engineer from one CSXT district to another, the date such engineer commences qualification on the district will be used as his seniority date." (JE 1 at 4). As both Plaintiff and CSXT state, the language "commences qualification on the district" refers to the date upon which the professional hires or transferees begin working in the district. This language therefore clearly and unambiguously provides the first date professional hires or transferees perform service in a district shall be used as their seniority date.

Also of import is the fact that CSXT and BLET entered into the 2001 BLET Agreement. This agreement mirrors the language found in the 1996 BLET Agreement in providing that "[c]ertified engineers, who are hired or transferred from another road, or from one former road to another former road

23

within the CSXT system, will establish a seniority date on the appropriate engineer seniority district roster, based on the date they commence qualifying on the district." (JE 1 at 5).[19] This language is also unambiguously clear that professional hires and transferees, upon the first date of service in a district, will rank ahead of trainmen and conductors who subsequently enter and complete engineer training.[20] Consequently, both the 1996 and 2001 BLET Agreements contain explicit provisions governing professional hires and transferees engineer seniority. The Board, however, decided not to apply Article XVI(b) of the 1996 BLET Agreement. Combine this with the Board's determination as to CSXT and Plaintiff's lack of contractual authority to establish the sequencing procedure in the 2001 BLET Agreement for placing professional hires and transferees because it would be to the disadvantage of trainmen promoted or awaiting promotion, and it further underscores that the Board's determination as to the placement of the forty-three engineers failed to draw its essence from the parties' agreements and instead imposed its own brand of industrial justice. See Enter. Wheel & Car Corp., 363 U.S. at 597; Loveless, 681 F.2d at 1276.

Moreover, as to the Board supporting its placement of professional hires and transferees by concluding that the January 2000 Agreement, as modified,[21] governs the placement of professional hires and transferees, this Court finds such a determination failed to draw its essence from the parties'

---

[19] The 2001 BLET Agreement also provides that "[e]ngineers establishing seniority under the provisions of this paragraph will not rank ahead of train service employees on the district who are currently engaged in engineer training, but will establish seniority ahead of train service employees whose names appear on hiring pool rosters but have not yet entered formal training." (JE 1 at 5-6).

[20] The Board's determination as to Plaintiff's contractual authority to enter into the 2001 BLET Agreement will be discussed below.

[21] This modification, as was previously discussed, is because Plaintiff's General Chairman recommended the Conrail acquisition date of June 1, 1999 be used instead of the January 1, 2000 date in establishing the standing of trainmen for promotion to engineer (JE 1 at 7).

agreements and instead allowed the Board to dispense its own brand of industrial justice. See Enter. Wheel & Car Corp., 363 U.S. at 597. In other words, besides being completely contrary to the express provisions in the 1996 BLET Agreement, this conclusion ignores the language in the modified January 2000 Agreement itself. The first sentence of the modified January 2000 Agreement states "[t]his refers to our discussions concerning how employees are selected for the Engineer Training Program." (JE 3 at B(1)(1) and JE 4 at exhibit F) Obviously, this sentence is not applicable to professional hires and transferees as they, already qualified as engineers, have no need to attend the Engineer Training Program. The agreement continues that "effective January 1, 2000, employees with a train service seniority date (on or after November 1, 1985) on the B&O Eastern or Western Consolidated Seniority Districts will be placed on the appropriate Engineer's Seniority Roster based upon their relative standing on their respective train service roster." Id.[22] The agreement also provides "[t]his arrangement is contingent upon the successful completion of the Engineer Training Program when it is first offered to the employee." Id. This language further emphasizes the January 2000 Agreement, as modified, did not govern the placement of professional hires or transferees, but rather was aimed at addressing issues surrounding the promotion of trainmen to engine service. The January 2000 Agreement, as modified, does not mention professional hires or transferees. Nor does it reference Article XVI(b) of the 1996 BLET Agreement which would be effectively repealed if the January 2000 Agreement, as modified, is applied as intended by the Board. Indeed, the Court notes that CSXT and Plaintiff entered into the 2001 BLET Agreement with language mirroring the language found in Article XVI(b) of the 1996 BLET Agreement, which demonstrates that Article XVI(b) was not intended

---

[22] Again, while Plaintiff disputes the finding that the January 2000 Agreement, as modified, was actually an agreement as the BLET International Division refused to allow it to be executed (Dkt. 46 at 13-14), the Board found that this understanding "rose to the level of a binding agreement" when the seniority rosters were published after being reviewed and acquiesced in by Plaintiff and UTU GCA (JE 1 at 22).

to be repealed. The Court therefore finds the Board's conclusion that the January 2000 Agreement, as modified, governs the placement of professional hires and transferees failed to draw its essence from the parties' agreements and thus cannot be used to bolster the Board's determination as to the placement of the professional hires and transferees.

**B.      Plaintiff's Contractual Authority to Enter into the 2001 BLET Agreement**

Alternatively, the Court also finds the Board's determination that Plaintiff's General Chairman lacked the contractual authority to enter into the 2001 BLET Agreement violative of the RLA. See  45 U.S.C. § 153 First (q) (arbitral award may be set aside if Board failed to comply with the RLA). The Board, in determining that the January 2000 Agreement, as modified, governed the placement of professional hires and transferees,  needed to justify how the 2001 BLET Agreement was inapplicable. In so doing, the Board found that Plaintiff's General Chairman lacked the authority to enter into the 2001 BLET Agreement. This finding is based in the Board's belief that the application of the 2001 BLET Agreement would "shield" the forty-three engineers in question from being slotted behind subsequently promoted train and yard service employees. The Board found this would "contravene" the contractual commitment in Article XIII of the 1985 Agreement and that Plaintiff's General Chairmen lacked such authority. The Court disagrees and finds the Board's determination failed to comply with the RLA.

Initially, the Board's determination that the 2001 BLET Agreement would "contravene" pertinent provisions in the 1985 Agreement is problematic for the Court. The 1985 Agreement was between CSXT and UTU and the 2001 BLET Agreement was between CSXT and Plaintiff. As the Court has already stated, the 1985 Agreement does not and cannot govern the placement of engineers on engineer seniority rosters as UTU does not represent engineers. More important to the Court, however, is the Board's finding Plaintiff's General Chairman lacked authority to enter into the 2001 BLET Agreement. CSXT's engineers,

26

in compliance with the RLA, selected BLET to be their representative for collective bargaining purposes. 45 U.S.C. § 152 Fourth. In accordance with the RLA, CSXT must therefore deal exclusively with BLET in collective bargaining agreements for engineers. See 45 U.S.C. § 152 Ninth. Moreover, the placement of professional hires and transferees on engineer seniority rosters is governed by collective bargaining agreements between CSXT and BLET. Dempsey, 16 F.3d at 839. Consequently, the Court finds BLET had authority to enter into the 2001 BLET Agreement and the Board's finding to the contrary failed to comply with the RLA.

**C.      CSXT & Article XIII of the 1985 Agreement**

CSXT argues the Board failed to confine itself to matters within its jurisdiction by purporting CSXT failed to comply with Article XIII of the 1985 Agreement as this issue was not submitted by the parties to arbitration. CSXT further argues that UTU GCA did not claim in its arbitration submission that CSXT failed to demonstrate a need for the forty-three engineers or that CSXT otherwise violated the relevant sections of Article XIII of the 1985 Agreement. UTU GCA contends even if this issue was not expressly submitted as a question, it was subsumed in the argument and it was at issue.

The Court finds the Board's examination of whether CSXT was in compliance with the 1985 Agreement did not exceed its jurisdiction. While it is accurate that the Board was not presented with this specific question in the issues submitted by the parties (JE 1 at 2), it nevertheless was inherent, if not explicitly obvious, the Board would seek to review any applicable agreements.[23]

**IX.     Conclusion**

Using the finding that CSXT violated the 1985 Agreement as a basis, the Board appears to have attempted to bolster its conclusion concerning placement of the professional hires and transferees by

---

[23] See Plaintiff's Ex Parte Submission to the Board (JE 2 at 15); (JE 2, exhibit 15 at 1-4); Arbitration Submission of UTU GCA (JE 3 at 1); Arbitration Submission of CSXT (JE 4 at 13).

ignoring the 1996 BLET Agreement, in finding Plaintiff's General Chairman did not have the contractual authority to enter into the 2001 BLET Agreement and in concluding the January 2000 Agreement, as modified, applied to the placement of professional hires and transferees. This line of reasoning resulted in the professional hires and transferees being placed behind subsequently promoted trainmen on the engineer seniority rosters.

However, based upon the foregoing, the Court finds the Board's determination as to the placement of professional hires and transferees on the Northern Lines engineer seniority rosters failed to draw its essence from the parties' agreements as it was contrary to the clear and unambiguous language in these agreements. Instead, the Board's determination allowed the Board to dispense its own brand of industrial justice. This aspect of the Board's award is therefore vacated and is remanded to the Board in accordance with 45 U.S.C. § 153 First (q).[24] Alternatively, the Court also finds the Board's conclusion that Plaintiff's General Chairman lacked authority to enter into the 2001 BLET Agreement to be violative of the RLA.[25]

In remanding the issue of the placement of the professional hires and transferees to the Board, the Court notes the Board, in light of the 1996 and 2001 BLET Agreements, should reexamine the proffered solution put forth by CSXT. This issue is incredibly complex and CSXT's proposed solution provides a reasonable compromise.

Accordingly, upon due consideration, it is hereby **ORDERED AND ADJUDGED**:

---

[24] The Court is not vacating the Board's finding that the January 2000 Agreement, as modified, rose to the level of an agreement. However, the Board's determination that the January 2000 Agreement, as modified, applied to professional hires and transferees failed to draw its essence from the parties' agreements. The January 2000 Agreement, as modified, only governs the placement of trainmen relative to other trainmen on the Northern Lines engineer seniority rosters.

[25] Because the Court found the Board's determination as to the placement of professional hires and transferees failed to draw its essence from the parties' agreements, the Court need not address the rational basis or due process causes of action raised by Plaintiff as grounds to vacate the award (Dkt 1 at 10-11).

1.      The issue concerning the placement of the forty-three professional hires and transferees on the Northern Lines engineer seniority rosters is **SET ASIDE** and **REMANDED** to the Board in accordance with 45 U.S.C. § 153 First (q) for entry of an order in accordance with the conclusions of the Court.

2.      Plaintiff's Motion for Summary Judgment (Dkt. 37) is **GRANTED** to the extent Plaintiff only moved to vacate the Board's award concerning the placement of professional hires and transferees.

3.      CSXT's Motion for Summary Judgment (Dkt. 41) is **GRANTED**.

4.      UTU GCA's Motion for Summary Judgment (Dkt. 35) is **DENIED**.

BY ORDER OF THE COURT, at Jacksonville, Florida, this __4th__ day of August, 2005.

Copies to:

Counsel of Record

JOHN H. MOORE II
United States District Judge